Lynn Marie BRIM, Appellant,

v.

Don Robert BRIM, Appellee.

No. 46782.

Court of Appeals of Oklahoma, Division 2.

Jan. 28, 1975.

Rehearing Denied Feb. 24, 1975.

Released for Publication by Order of Court of Appeals March 27, 1975.

Truman B. Simpson, Shawnee, for appellant.

Lamb & Maxwell, Enid, for appellee.

BRIGHTMIRE, Judge.

Custody of a three-year-old white male was changed to his father after evidence disclosed the mother was sharing her bed three to five nights a week with a paramour who appears to have been married to another woman.[1] The mother appeals.

The 25-year-old white female married appellee in February 1969. To them a child was born May 19, 1970. During the marriage Mrs. Brim, a sociologist, was employed for a time with the "Welfare Department as an Eligibility Worker," and later with the City of Shawnee Park and Recreation Department at the "Lincoln Community Center," "The Rap Center," and at the time of the hearing at the "Hope House" which she described as a state job in which: "I work with the juveniles through the Court."

It was during the summer of 1971 while working at "The Rap Center" that she became acquainted with one Melvin Jackson —the man who later became her lover. On May 30, 1972, Mrs. Brim sued Mr. Brim for a divorce on the ground of incompatibility and obtained one along with custody of her young son on July 12, 1972.

She did not know exactly when she first became intimate with Mr. Jackson but said it was "probably before the summer of '72 ended," and that she began having sexual relations with him "toward the end of the summer" at her house.

Mr. Jackson and Mrs. Brim ventured out in public together twice—both times to local private clubs. They had seen only one "stag movie" together and this was in early 1973 at the home of a female friend, however, her son was not with her when the "illicit sex acts and pornography" was shown. Not long before the hearing Mrs. Brim and Mr. Jackson made a trip to New York for the purpose, according to her, of "visiting friends of mine who were at school at Cornell University." The child on this occasion was left with his father.

Mrs. Brim said while she has no plans to marry Mr. Jackson, she had no inclination to discontinue having "sexual relations with him . . . quite frequently." Their cohabitation continued right up to the time of the hearing. Ordinarily Mr. Jackson sleeps in Mrs. Brim's bed and the

---

1. The 28-year-old man testified he had obtained a "divorce" from the mother of his two youngsters in 1971 but continued to live with her up until four months before the modification hearing in question was held (July 18, 1973) because, he said, "It was convenient for us to live together. . . . She was out of work, and I was working."

little boy sleeps "on the couch in the living room." She denies her son has ever witnessed any acts of intimacy between her and her male friend. If the youngster happens to come into the bedroom then Mr. Jackson will "immediately . . . [get] out of bed and put his clothes on and . . . [go] in the other room."

Mrs. Brim was receiving psychiatric treatment at the time of the hearing and had been for several months.

Mr. Brim, age 23, on the other hand is living with his parents on a small acreage on the outskirts of Enid—the place where his son would be living if the father gained his custody.

At the close of the evidence the trial court modified its previous order and granted Mr. Brim custody of his son "solely and only . . . for the best interest of the parties' minor male child," saying that when "a woman starts living with a man without the benefit of marriage, where the man spends three to five nights a week in that home where the child is . . . . whether or not this man is married or unmarried . . . [t]his does not agree with the Court's concept of moral conduct."

█ The force and effect of Mrs. Brim's argument is that her former husband failed to "carry the burden on showing that there was a substantial change of condition bearing directly upon the welfare and best interests of the child. . . . [thus] there is an obvious abuse of discretion . . . in . . . changing custody from the appellant to appellee." [2]

█ We are of the opinion, however, that appellee did carry the burden of proof and that the trial court did not abuse its discretion.

To begin with Mrs. Brim's own testimony forecloses any doubt about a substantial post-divorce change in the home environment of the little boy. She said she did not become intimate with Mr. Jackson until about a month or two after the divorce and the first custody order was rendered, so it follows his part-time live in at the child's home was a change that occurred after the previous order—a change which we think was a substantial one.

Was the change one affecting in any respect the child's temporal, mental or moral welfare? Mrs. Brim argues it was not because there was no proof "that the mother's conduct had a direct effect upon the child." Of course just what type or kind of proof of a direct effect she has in mind we do not know. But as a sociologist Mrs. Brim should appreciate the fact that communities do establish standards of conduct either through custom or law, with which compliance is considered right and a departure from which the adult majority considers wrong. She must know that the brain of a child begins to record impressions through his senses from infancy (even while *en utero* according to some scientists) and cerebral tapes made during this very early period are the ones which later on psychiatrists may have to be hired to erase in order to relieve some serious mental malfunction.

So here admittedly we have a situation where a three-year-old's subconscious is recording a man staying in the house and sleeping in the same bed as his mother three to five nights a week. He may not at all have any meaningful understanding of what is going on. He is unlikely to realize the counterculture implications, or the antisocial character of the relationship between his mother and Mr. Jackson. But

2. Mrs. Brim concedes that in awarding custody of a minor child, the court "should give paramount consideration to what appears to be for the best interests of the child in respect to its temporal, mental and moral welfare. . . . [and to obtain modification of a child order, applicant must] show a substantial change in conditions since entry of [last] order . . . ." Earnst v. Earnst, Okl., 418 P.2d 351 (1966); Young v. Young, Okl., 383 P.2d 211 (1963). Though unfitness of a mother is an element to be considered it is not necessarily a controlling or essential finding. Owens v. Owens, Okl., 494 P. 318 (1972); Gibbons v. Gibbons, Okl., 442 P.2d 482 (1968); Shrout v. Shrout, 224 Or. 521, 356 P.2d 935 (1960).

still his brain records what his eyes see and his ears hear. And unless he can begin now to learn through the same senses society's conceptual norm of man-woman, mother-child, father-child relationships, it will, in the next few significant months, become fixed in his mind that his mother's relationship with Mr. Jackson is one society accepts as proper. And because of all people it is his mother involved he can become an excellent candidate for a real psychic hang-up when faced with having to accept, live and cope with existing incompatible social mores. And this problem is entirely independent of the issue of whether established mores are ill-conceived and in need of a correctional social force. So the direct effect on the child at this point as we see it is that (1) he is not being subconsciously introduced to the community's generally accepted moral code of conduct relating to a man-woman relationship; (2) he is contrarily being subconsciously conditioned to assume his mother's conduct in the home is generally accepted as proper.

It can be seen, therefore, from the foregoing that the home environment does have a "direct effect" on the three-year-old. Because the effect implies a future consequence its exact nature cannot be foretold with certainty. But this does not mean the court must await the finite proof of ultimate results. This would be absurd. The fact finder is entitled to infer that any prolonged subjection of a young child to a countercultural environment probably will have a future adverse effect on the small one's psychological well-being, and if the other parent offers a less risky alternative, then it seems to us that the paramount consideration—the child's welfare—is best served by a transfer of custody which will improve his chances for adequate adjustment later to establishment's society as well as reduce the risk of later impairment of his mental helth.

The availability of such a custodial alternative—as in this case—means that the court can choose it without passing moral judgment on the social, cultural, or philosophical aims, views, or disappointments of any of the adults involved. It was in recognition of such alternative that the trial judge explained, in terms of the subject matter for decision in this case, that he was unconcerned with the propriety or lack thereof regarding what Mrs. Brim and Mr. Jackson wanted to do or how they wanted to live their lives, except as their conduct affected the child. Like other parents Mrs. Brim took on an added responsibility —and in a sense a restrictive one—when she gave birth to a child and while the courts can provide no remedy for the child's loss suffered as a result of the marital failure it can help reduce it by awarding custody to the parent who is most willing and able to achieve normalization of the youngster's temporal, mental and moral needs during the early formative years.

■ Contrary to Mrs. Brim's theory it was not necessary for the court to find in this case she was unfit as a mother in order to change custody of the child. The court did not specifically pass on this issue and in view of what we have already said we see no reason to do so either.

■ The only contention left to dispose of is Mrs. Brim's first one—that the change of custody was reversibly erroneous because it was premised solely on the fact that she, a white woman, "had been cohabiting with a black man, thereby denying her right of freedom of association under the First and Fourteenth Amendments of the Constitution of the United States, and her rights of privacy and of due process and equal protection of the law under the 14th Amendment of the Constitution of the United States."

In supporting argument Mrs. Brim quite unequivocally asserts that the "decision of the Court to deprive appellant of custody of her child" was "based on racial issues" and therefore deprived her of her freedom of association and all the other constitutional rights mentioned above.

The trial judge responded to this suggestion at the close of the case thusly: " . . . [T]his is where the buck stops, this is where the Court has to take all things into consideration in reaching its

judgment. Perhaps I am a square judge and perhaps I wouldn't see things as my two long-haired sons would see them, but based upon the evidence as this Court sees it, it is to the best interests of this child that he be removed from his present home and I am granting the father temporary custody of the child pending an examination of his home by the State Welfare Department . . . .

"Now, you can read into this whatever you want to read into it, but as far as this Court is concerned this is not a question of color, it is a question of morals and to the best interest of the child. When a woman starts living with a man without the benefit of marriage, where the man spends three to five nights a week in that home where the child is . . . whether or not this man is married or unmarried . . . . [t]his does not agree with the Court's concept of moral conduct."

Of course Mrs. Brim can say the disclaimer was actually a disguise for the concealment of a racially motivated conclusion. But to do so she must be prepared to say the judge does not accurately perceive the moral code in this part of the country and that if Mr. Jackson were a white man under the same circumstances there would be no immoral implications from the fornication. As a trained social worker we doubt Mrs. Brim is prepared to sponsor such a notion regardless of how wrong she may consider the current social order to be. Certainly we are not. And without committing ourselves to either praise or condemn Mrs. Brim's life-style, we can say without fear of prognosticatory disappointment that a resolution extolling its virtues if submitted to a vote of the citizenry would fall far short of achieving a consensus whether her swain be white, yellow, red, brown or black.

The only case she cites in support of her constitutional proposal, although dealing with child custody in an interracial situation, is not helpful here because the facts raise an entirely different issue. The case is Commonwealth ex rel. Lucas v. Kreischer, 450 Pa. 352, 299 A.2d 243 (1973). In it the Pennsylvania Supreme Court reversed the lower court and held a divorced white woman's subsequent marrige to a black man was not alone grounds for denying her custody of her children—ages six, eight and nine—absent evidence that they would suffer detriment from living with their mother under such circumstances. The lower court's recognition that the children would be victims of "almost universal prejudice and intolerance of interracial marriage" was not considered a compelling reason for denying custody to the mother.

The case does not hold out hope that the high court of Pennsylvania will reach the same conclusion on facts similar to the ones we have here, notwithstanding in *Kreischer* the court seems to give more attention to the mother's desires than to the welfare of the children. Certainly any constitutional freedom of association possessed by Mrs. Brim is no more absolute than is, for instance, her constitutional freedom of speech. She has no constitutional right to falsely yell fire in a crowded theater. Schenck v. United States, 249 U.S. 47, 39 S.Ct. 247, 63 L.Ed. 470 (1919). And we hold she has no constitutional right to subject her three-year-old boy to a home environment society currently considers immoral.

Affirmed.

NEPTUNE, P. J., and BACON, J., concur.